# United States Tax Court

T.C. Memo. 2023-24

ESTATE OF WILLIAM A.V. CECIL, SR., DONOR, DECEASED,
WILLIAM A.V. CECIL, JR., CO-EXECUTOR,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

ESTATE OF MARY R. CECIL, DONOR, DECEASED, WILLIAM A.V.
CECIL, JR., CO-EXECUTOR,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket Nos. 14639-14, 14640-14.                Filed February 28, 2023.

————————

*David D. Aughtry* and *John W. Hackney*, for petitioners.

*Joel D. McMahan*, *Christopher A. Pavilonis*, and *A. Gary Begun*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, *Judge*: William A.V. Cecil, Sr., and Mary Ryan Cecil (collectively, petitioners; respectively, Mr. Cecil and Mrs. Cecil) petitioned the Court separately to redetermine respondent's determination of a $13,022,552 deficiency in his or her federal gift tax

[*2] for 2010.[1] On November 18 and 19, 2010 (valuation dates), Mr. Cecil caused a transfer of his revocable trust's class B (generally nonvoting) stock in the Biltmore Company (TBC) to petitioners' five grandchildren, and Mrs. Cecil transferred class A (voting) stock in TBC to petitioners' two children. Petitioners timely reported to the Internal Revenue Service (IRS) on Forms 709, United States Gift (and Generation-Skipping Transfer) Tax Return, that these transfers were gifts during 2010, and they reported a fair market value for each gift as of the time of the corresponding transfer.

The deficiencies result from respondent's determination that petitioners' reported fair market values were too low. Petitioners allege in their Petitions that the values were actually too high and, accordingly, that they are entitled to refunds. We consolidated the cases for trial, briefing, and opinion and now decide the fair market value of the transferred TBC stock (subject stock) on the valuation dates.

FINDINGS OF FACT

The parties have stipulated some facts, and the stipulated facts are so found. The Stipulation of Facts and the attached Exhibits are incorporated herein by this reference. Petitioners, now deceased, were husband and wife during all relevant times, and they resided in North Carolina when their Petitions were timely filed.

I.    *Family Background*

Petitioners have two adult children, Bill Cecil and Diana Cecil Pickering (Dini Pickering). Bill Cecil and his wife, Virginia Rott Cecil, have three children: Ryan Jordan Vanderbilt Cecil, Aubrey Lea Amherst Cecil, and Willam Robert Vanderbilt Cecil. We refer to these five individuals collectively as the Cecil family. Dini Pickering and her husband, George W. Pickering II, have two children: Chase Kennedy Cecil Pickering and Devon Lee Cecil Pickering. We refer to these four individuals collectively as the Pickering family.

---

[1]Petitioners later died and were substituted for this proceeding by their co-executor, William A.V. Cecil, Jr. (Bill Cecil). Additionally, some monetary amounts are rounded to the nearest dollar.

**[\*3]** II.    *TBC*

    A.    *Background*

        1.    *The Biltmore House*

Between 1889 and 1895, George W. Vanderbilt built the Biltmore House in the Blue Ridge Mountains in Asheville, North Carolina. The Biltmore House is a French Renaissance chateau that consists of over four acres of floor space and remains the largest privately owned house in the United States. Mr. Vanderbilt died in 1914, and he left the Biltmore House and its surrounding acreage to his only child, Cornelia Cecil née Vanderbilt (Mr. Cecil's mother).

        2.    *TBC*

TBC, a Delaware corporation, was formed on March 30, 1932, by Cornelia Cecil and others, and during the same year, it became eligible to conduct business in North Carolina. Also in 1932 the Biltmore House and its surrounding acreage (Estate) were contributed to TBC. In 1979 Mr. Cecil and his brother, George Cecil, then TBC's owners, disagreed on TBC's future. They ended up breaking up TBC, with George Cecil surrendering all of his shares in TBC in exchange primarily for TBC's dairy operations inclusive of 3,000 acres of the Estate. TBC elected to be taxed as an S corporation in 1982 and continues to be characterized as such.

    B.    *Operations and Relevant Financial Information*

        1.    *Roles of Dini Pickering and Bill Cecil*

Dini Pickering is vice chairman of TBC's board of directors. She has worked for TBC for approximately 32 years and has served in that position over approximately the last 15 of those years.

Bill Cecil is TBC's (and its related entities') president and chief executive officer. He has served in those positions for over 20 years.

        2.    *Business Operations*

TBC operates primarily in the travel and tourism/historic hospitality industry. The heart of its business is offering its guests the opportunity to go back in time and experience the Gilded Age. Originally, TBC only offered tours of the Biltmore House and the

[*4] adjoining gardens, and the tours were considered a roadside attraction. In 1995 TBC instituted a long-range plan to become a multiday destination and eventually expanded the Estate to include hotels, restaurants, retail stores, and various outdoor activities. During 2010 TBC operated at least 17 lines of business and employed 1,304 employees (over 1,800 combined full-time and part-time employees including associated businesses).

### 3. *Revenue Sources*

TBC's paying visitors may access five main areas of the Estate: the Estate entrance, including the Gate House Shop, Lodge Gate, Group Sales Office, and Reservations and Ticket Center; Biltmore House and Gardens; Antler Hill Village and Winery; Inn on Biltmore Estate; and Deerpark, including the Deerpark Restaurant, Lioncrest, and carriage and trail ride barns. TBC generates revenue from five retail outlets; eight restaurants, one of which is a catering facility; landscaping; tickets and tours (including segway tours); Land Rover driving experience and school; river rafting; fly fishing; equestrian training; timber production; and farming. During 2010 TBC generated most of its revenue from admissions to its premises and from restaurant and merchandise sales.

With the exception of 2008, a year within the Great Recession of 2007 through 2009 and for which TBC realized a $1,459,000 loss, TBC has realized a profit every year since 1995. During its fiscal year ended June 30, 2010, adult visitors paid between $35 and $69 for admission depending on the time of the year. In 2010 TBC reported that it realized approximately $70 million in revenue. Of that total revenue, TBC realized $38,437,950 from admission tickets.

### 4. *Estate's Ranges*

The Estate has a West Range (approximately 3,000 acres of land) and an East Range. The West Range contains all the forestry and farming, and it is used for agricultural, forestry, and recreational activities. Busbee Mountain, one of TBC's operating and income-generating assets, is on the West Range. Busbee Mountain is the main source of water for the Estate, and it generates annually 28 million gallons of water and $110,000 in water savings. TBC also conducts timber operations and leases cell phone towers on Busbee Mountain.

In 1993 TBC sold the West Range to Bill Cecil and Dini Pickering for $6 million and as part of that sale leased back the West Range. This transaction was meant to ensure that the West Range remained in

[*5] petitioners' extended family forever. TBC received a 30-year installment note as payment for the sale. On the valuation dates, $2,700,000 of that note's principal remained unpaid.

TBC owns the East Range. The East Range includes places for equestrian, hiking, biking, farming, and timber activities. Also on the East Range are the Biltmore House, formal gardens, Antler Hill Village, a vineyard, the Inn on Biltmore Estate, Deerpark, retail shops, restaurants, and a ticket center. TBC uses all of the East Range to generate earnings.

### 5. *2010 Assets and Liabilities*

TBC's reported assets and liabilities were $53,580,000 and $33,349,000, respectively, on November 30, 2010. Included in its assets were agricultural land in North Carolina and a multimillion dollar portfolio of fine art, antiques, and other collectibles. Its artwork included the following valuable paintings: (1) the Portrait of Frederick Law Olmsted by John Singer Sargent; (2) the Waltz by Anders Zorn; (3) Mrs. George W. Vanderbilt by Giovanni Boldini; (4) Rosita by Ignacio Zuloaga y Zabaleta, and (5) Angelique and Roger on the Hippogriff by Antoine-Louis Barye.

TBC has 46 trademarks and a trade name registered with the U.S. Patent and Trademark Office.

## III. *Ownership and Related Agreements*

### A. *1989 Ownership and 1989 Shareholders' Agreement*

Mrs. Cecil, Bill Cecil, and Dini Pickering were three of TBC's shareholders on December 26, 1989, each owning 1 share of its then class B common stock. On that day, they entered into a Shareholders' Agreement. As of that time, TBC had three classes of stock.

### B. *1997 Amendment to Certificate of Incorporation*

On August 8, 1997, TBC's Certificate of Incorporation was amended to reclassify TBC's three existing classes of stock into two classes of common stock inclusive of seven issued shares of class A common stock and 9,993 issued shares of class B common stock. These two classes of stock differ only in their voting rights. The amendment states as to their voting rights:

**[*6]**     Class A Common: Each holder of class A Common Stock shall be entitled to one vote for each share of such stock standing in his name on the books of the Corporation. Said voting rights shall be with respect to all matters that may be subject to a vote of stockholders under the Bylaws of the Corporation, under the General Corporation Law of the State of Delaware, or otherwise.

Class B Nonvoting Common: The holders of class B Nonvoting Common Stock of the Corporation shall not be entitled to vote on any matter except as to matters in respect of which they shall be indefeasibly vested by statute with such right.

C.     *Voting Trust Agreement*

On June 30, 1999, TBC, petitioners, Bill Cecil, and Dini Pickering, as the corporation and its shareholders, respectively, and Henry P. Hoffstot, Jr., as an "independent trustee," entered into a Voting Trust Agreement (1999 Voting Trust Agreement). The 1999 Voting Trust Agreement was meant:

> to secure continuity and stability in the Company's policies and management and to coordinate the Company's policies and management with other Biltmore Estate Business Entities, the stock of which is owned by some or all of the Shareholders, and in order to provide that the four Shareholders who sign this Agreement and the lineal descendants of these four Shareholders, will control for the maximum time legally permissible all the development, use and management of the Company as well as policy and management decisions pertaining to other Biltmore Estate Business Entities, these Shareholders have determined to place all their shares of voting stock in the Company with the Trustees and their successors in Trust as hereafter provided.

In accordance with the 1999 Voting Trust Agreement, each signatory shareholder deposited his or her stock in a trust and acted as trustee. The only persons eligible to later become a trustee were lineal descendants of Bill Cecil and Dini Pickering. While petitioners are trustees, all decisions had to be made by a majority of the trustees. If petitioners were not trustees, decisions would be made by a majority of

[*7] each side of the two families (the Cecils and the Pickerings) with each family having a 50% voting strength. The trust had a ten-year term.

Any decision to sell any land, structure, assets or stock of TBC or any present or future Estate business entity required the vote of two-thirds of the Cecil family trustees and two-thirds of the Pickering family trustees. The trustees set TBC's policies and general operating procedures relating to the operation of TBC and the Estate. The Trustees elected the board of directors and confirmed the appointment of senior officers.

IV.    *Family Business Preservation Program*

A.    *Background*

In or around 2000 or 2001 Dini Pickering met Craig Aronoff, a consultant with the Family Business Consulting Group. Mr. Aronoff encouraged Dini Pickering to hold family meetings and to create a structure for her family that would allow them to operate TBC more efficiently. Dini Pickering began exploring family business planning. She read books on the subject as well as material from the Family Business Consulting Group.

Dini Pickering later started the Family Business Preservation Program for TBC in 2003. As a part of the program, petitioners, the Cecil family, and the Pickering family would hold two meetings annually. During these meetings they would work on policies and educational programs for the benefit of their families, which were intended to help them become more effective owners of TBC.

The children of Bill Cecil and Dini Pickering attended these meetings. Those children were 8 to 15 years old as of the first meeting. In the early years Dini Pickering strived innovatively to keep the children focused in the meetings and participating in the business discussions. As the children grew older, they attended educational seminars that focused on topics such as financial literacy or family-based money management. These meetings and seminars were intended to prepare the next generation to take over TBC's management.

[*8]    B.    *Policies*

Petitioners, the Cecil family, and the Pickering family adopted the following three policies as a result of these meetings.  The first policy, the premarital policy, requires that each family member enter into a prenuptial agreement before marriage.  The prenuptial agreement must ensure that all separate property remain separate during the marriage and not be subject to a division in the event of a divorce.  This policy is intended to ensure that all TBC stock remain in the Cecil and the Pickering families.  The second policy, the family employment policy, requires that any Cecil or Pickering family member seeking employment in TBC must have a four-year college degree and at least one year of outside employment.  The third policy, a family code of conduct, requires that members of the Cecil and the Pickering families treat others with respect, act ethically, obey the law, respect confidentiality, avoid conflicts of interest, protect family business property, represent the best interests of the family and family business, and practice open, honest, and effective communication.  The three oldest of the five children of the Cecil and the Pickering families have adhered to these policies.  None of these three children has any desire to ever sell the TBC shares he or she would later receive (see further discussion *infra* p. 28), or to vote to liquidate TBC's assets.

V.    *2009 Shareholders' Agreement*

On December 16, 2009, the shareholders that owned all issued and outstanding shares of TBC stock entered into the 2009 Shareholders' Agreement.  The 2009 Shareholders' Agreement states:

> [T]he Parties agree that the success of the Corporation requires the active interest, support, and the personal attention of the Shareholders and for that reason it is not advisable to permit the stock of the Corporation to go upon the open market for sale except as otherwise permitted under the terms of this Agreement.

TBC and its shareholders confirmed the purpose of the 2009 Shareholders' Agreement as providing (i) the continued ownership and control of all issued and outstanding TBC shares; (ii) the harmonious and future conduct of the business; and (iii) a stock transfer mechanism to operate when a shareholder dies, becomes incapacitated, or otherwise needs to sell company stock.

**[\*9]** Under the terms of the 2009 Shareholders' Agreement, a shareholder may transfer, with or without consideration, his or her shares to any other shareholder who is a party to the agreement or to any of the shareholder's lineal descendants. As to a proposed transfer to a nonfamily member, the transferor must first notify the other shareholders and TBC of the proposed transfer and receive a notice of consent from each shareholder. If a shareholder receives an offer from a nonfamily member to buy shares from the shareholder, the shareholder must notify the other shareholders and TBC within ten days at which point the other shareholders may purchase all but not less than all of the shares at the lesser of the purchase price or the price set forth by a valuation method contained in the 2009 Shareholders' Agreement. As a condition of a transfer to any person who is not bound by the 2009 Shareholders' Agreement, the transferee must agree to be bound by the terms of that agreement.

VI.  *Gift Transfers*

    A.  *2010*

Immediately before November 18, 2010, TBC's outstanding stock was owned as follows:

| *Owner* | *Number of Shares* | *Percentage*[2] |
|---|---|---|
| Class A Common Stock | | |
| Mr. Cecil, Trustee under the William A.V. Cecil Revocable Trust Agreement dated August 13, 1999 | 3 | 42.86% |
| Mrs. Cecil | 1 | 14.29% |
| Bill Cecil | 1 | 14.29% |
| Dini Pickering | 1 | 14.29% |
| Bill Cecil and Dini Pickering, as tenants in common | 1 | 14.29% |
| Total Shares | 7 | |
| Class B Common Stock | | |
| Mr. Cecil, Trustee under the William A.V. Cecil Revocable Trust Agreement dated August 13, 1999 | 9,337 | 93.37% |
| Bill Cecil | 328 | 3.28% |
| Dini Pickering | 328 | 3.28% |
| Total Shares | 9,993 | |

---

[2]These percentages are the percentages which the parties stipulated.

[*10]  B.    *Gifts*

On November 18, 2010, Mrs. Cecil transferred, by gift and in undivided equal shares, her interest in one share of TBC class A common stock to Bill Cecil and Dini Pickering.  Two new stock certificates were created for Bill Cecil and Dini Pickering, each certificate stating that "[t]he sale, transfer, assignment or pledge of this stock certificate is restricted pursuant to the terms of a Shareholder Agreement dated the 16 day of December 2009."

On November 19, 2010, Mr. Cecil, in his capacity as trustee of the William A.V. Cecil Revocable Trust, transferred 9,337 shares of TBC class B common stock to himself.  On the same day, he transferred by gift his interest in those shares to petitioners' five grandchildren, in separate trusts, as follows:

| Donee | Class B Common Stock | |
|---|---|---|
| | *Shares* | *Percentage*[3] |
| William A.V. Cecil Irrevocable Qualified Subchapter S Trust for Ryan Cecil | 1,556.16 and 2/3 | 15.57% |
| William A.V. Cecil Irrevocable Qualified Subchapter S Trust for Aubrey Cecil | 1,556.16 and 2/3 | 15.57% |
| William A.V. Cecil Irrevocable Qualified Subchapter S Trust for Robert Cecil | 1,556.16 and 2/3 | 15.57% |
| William A.V. Cecil Irrevocable Qualified Subchapter S Trust for Chase Pickering | 2,334.25 | 23.36% |
| William A.V. Cecil Irrevocable Qualified Subchapter S Trust for Devon Pickering | 2,334.25 | 23.36% |
| Total Shares | 9,337 | |

Each stock certificate stated that "[t]he sale, transfer, assignment or pledge of this stock certificate is restricted pursuant to the terms of a Shareholder Agreement dated the 19th day of November 2010."  This Shareholder Agreement added the trusts for the grandchildren as signatories.

Each gift of the class A and B common stock imposed upon the shareholder the obligation to pay tax on his or her distributive share of TBC's income, with no guaranty of sufficient dividend distributions to pay that tax.

---

[3]These percentages are the percentages which the parties stipulated.

[*11] VII.   *Voting Rights and Stock Transfer Restrictions*

TBC's Articles of Incorporation, TBC's Amended and Restated By-Laws as of August 21, 2009 (By-Laws), and the 2009 Shareholders' Agreement set out rights and powers with respect to the TBC stock as of the valuation dates.

The By-Laws regulate how shareholders, board members, and executives control TBC.   Each class A common stock shareholder receives one vote per share, with decisions made by the majority of the votes cast.  A quorum generally requires the presence of two-thirds of all outstanding class A common stock to be present in person or by proxy.

TBC's board of directors (Board) manages its business and affairs. Class A common stock shareholders elect directors by a majority vote. The presence in person of a majority of the Board constitutes a quorum to transact business.  The Board generally acts by a majority vote of the directors.  The Board elects officers by majority vote.  By majority vote, the Board decides when and whether to make the accounts, books, minutes, and other records of TBC available to stockholders.  The Board declares dividends by majority vote.

VIII.   *Notices of Deficiency*

Each petitioner timely filed Form 709 for 2010.  On the Forms 709, petitioners properly elected to treat the transfers of their stock as split gifts under section 2513.[4]  Each form included as an attachment an appraisal of the gifts by Dixon Hughes based on a weighted average of the subject shares (using an asset approach and an income approach). Petitioners commissioned the Dixon Hughes appraisal for purposes of reporting their gift tax liabilities on their Forms 709.   Petitioners reported a value of $3,308 per share for class A common stock and $2,236 per share for class B common stock.   Each petitioner reported total taxable gifts of $10,438,766.

Petitioners' Forms 709 were selected for audit, and respondent ultimately issued petitioners separate notices of deficiency on March 24, 2014.  The notices of deficiency disregarded the existence of TBC and attributed no weight to its going-concern value.   The numerical

---

[4]Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*12]** adjustments in the notices of deficiency reflect the enterprise value of TBC based solely on an asset liquidation assumption.

OPINION

I.     *Burden of Proof*

Except as otherwise provided by statute or determined by the Court, the Commissioner's determinations are presumed correct, and taxpayers bear the burden of proving that the determinations are erroneous.  Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). The burden of proof (or a portion thereof) may sometimes shift to the Commissioner.  *See, e.g.*, § 7491(a) (providing that the burden of proof in a gift tax setting such as here may shift to the Commissioner as to discrete factual issues if certain conditions are met); *Helvering v. Taylor*, 293 U.S. 507, 515 (1935) (holding that the burden of going forward with evidence to establish the amount of a deficiency may shift to the Commissioner where determination is arbitrary and excessive).  The record at hand allows us to decide these cases on the basis of a preponderance of the evidence, without regard to which party bears the burden of proof.  We therefore proceed to do so and need not and do not decide which party actually bears the burden of proof.  *Cf. Blodgett v. Commissioner*, 394 F.3d 1030, 1039 (8th Cir. 2005), *aff'g* T.C. Memo. 2003-212; *Polack v. Commissioner*, 366 F.3d 608 (8th Cir. 2004), *aff'g* T.C. Memo. 2002-145; *Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340; *Deskins v. Commissioner*, 87 T.C. 305, 322 n.17 (1986).

II.     *Gift Valuation*

A.     *In General*

A tax is imposed on the transfer of property by gift during a calendar year.  § 2501.  The value of a gift made in property is "the value thereof at the date of the gift."  § 2512(a).  That value is "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts."  Treas. Reg. § 25.2512-1; *see also* Rev. Rul. 59-60, 1959-1. C.B. 237.  The willing buyer and the willing seller are hypothetical persons rather than specific individuals or entities, and the characteristics of these hypothetical persons are not necessarily the same as the personal characteristics of the actual seller or a particular buyer.  *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 218 (1990).  The valuation of stock is

**[\*13]** ultimately a question of fact in which the trier of fact must weigh all relevant evidence and draw appropriate inferences. *CSX Transp., Inc. v. Ga. State Bd. of Equalization*, 552 U.S. 9, 18 (2007); *Hamm v. Commissioner*, 325 F.2d 934, 938 (8th Cir. 1963), *aff'g* T.C. Memo. 1961-347; *Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part on other grounds, and remanded in part sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006).

B.    *Valuation Approaches*

1.    *Overview*

Generally, three approaches are used to determine the fair market value of property: (1) the market approach, (2) the income approach, and (3) the asset-based approach. The question of which of these approaches to apply in a given case is a question of law. *Bank One Corp.*, 120 T.C. at 306–07.

2.    *Market Approach*

The market approach compares the subject property with similar property sold in an arm's-length transaction in the same timeframe. *Id.* at 307. This approach values the subject property by taking into account the sale price of the comparable property and the differences between the comparable property and the subject property. *Id.* This approach measures value properly only when the comparable property has qualities substantially similar to those of the subject property. *Id.*

3.    *Income Approach*

The income approach capitalizes income and discounts cashflow. *Id.* This approach values property by computing the present value of the estimated future cashflow as to that property. *Id.* The estimated cashflow is ascertained by taking the sum of the present value of the available cashflow and the present value of the residual value. *Id.*

4.    *Asset-Based Approach*

The asset-based approach generally values property by determining the cost to reproduce it. *Id.* One example of an asset-based approach in the setting of a nonpublicly traded corporation is to value the corporation on the basis of the fair market value of its net assets (i.e., the fair market value of its assets less its liabilities). *See, e.g.,*

**[\*14]** *Estate of Jones v. Commissioner*, T.C. Memo. 2019-101, at \*29; *Estate of Noble v. Commissioner*, T.C. Memo. 2005-2, slip op. at 17.

C.     *Split Gifts*

Section 2513(a) provides: "A gift made by one spouse to any person other than his spouse shall, for the purposes of this chapter, be considered as made one-half by him and one-half by his spouse," as long as both spouses have properly signified their consents to that treatment. Section 2512, which governs the valuation of gifts, is found in chapter 12 of subtitle B of the Internal Revenue Code, which is the chapter containing section 2513. Consistent with petitioners' proper election to treat each gift here as a split gift under section 2513, we consider those gifts as made one half by Mr. Cecil and one half by Mrs. Cecil.

III.     *Experts*

A.     *General*

The parties dispute the value of the subject stock, and each party has retained and at trial called experts to testify in support of their or his proffered value of the stock. In deciding valuation cases, courts often hear the views of expert witnesses. *See generally* Rule 143(g) (providing that an expert's direct testimony in a proceeding in this Court is generally "heard" by way of his or her expert report). We are not bound by the opinion of an expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Bank One Corp.*, 120 T.C. at 332*; Estate of Newhouse*, 94 T.C. at 217. We may accept the opinion of one expert over that of another, *see Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980), and we may select what portions of each expert's opinion, if any, to accept, *Parker v. Commissioner*, 86 T.C. 547, 562 (1986). Because valuation involves an approximation, the figure at which we arrive need not be directly traceable to specific testimony if it is within the range of values that may be properly derived from consideration of all the evidence. *Estate of True v. Commissioner*, T.C. Memo. 2001-167, slip op. at 171 (citing *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285), *aff'd*, 390 F.3d 1210 (10th Cir. 2004).

**[\*15]** B. *Petitioners' Experts*

Petitioners' experts are David Adams and George Hawkins.

  1. *Mr. Adams*

    a. *Overview*

Mr. Adams works for Adams Capital, Inc., as a business valuation appraiser. He founded Adams Capital, Inc., and beforehand was engaged in business valuation services with Coopers & Lybrand, LLP, and KPMG Peat Marwick, LLP. He has a master's in business administration from Georgia State University and is a member of the American Society of Appraisers. He appraised the subject stock relying exclusively on TBC's representations and financial documentation.

Mr. Adams appraised the stock using the income approach and the market approach. As to the former, he applied the discounted cashflow (DCF) method. As to the latter, he applied the guideline public company (GPC) method and the similar transactions method. He rejected the asset-based approach of valuing TBC's assets directly because the number of shares was too small to force a liquidation and he had heard from TBC's owners and management that TBC would not be liquidated in the foreseeable future. He concluded that TBC is unlikely to be sold within the next 30 years.

    b. *DCF*

Mr. Adams concluded for purposes of his DCF analysis that a discount rate of 15% was appropriate based on TBC's weighted average cost of capital. He predicted that TBC would grow by 1% in 2010, 5% in 2011, 5% in 2012, 5% in 2013, 4% in 2014, and 3% in 2015. He totaled his forecasted cashflows, subtracted interest-bearing debt, added back the value of any nonoperating asset, and applied a 30% discount for a lack of marketability to arrive at $9,030,059.

    c. *GPC*

The GPC is used to calculate the fair market value of a business on the basis of comparison to publicly traded companies in similar lines of business. The conditions and prospects of companies in similar lines of business depend on common factors such as overall demand for their products and services. Comparable company values are measured on the basis of stock prices. The comparable company value is divided by

**[\*16]** an earnings parameter (e.g., sales, net income, earnings before interest and taxes (EBIT)) or balance sheet parameter (e.g., total shareholder's equity, assets) to arrive at a valuation multiple. The resulting multiple is applied to the subject company to arrive at its fair market value.

Mr. Adams identified five companies as comparable companies. One company, Peak Resorts, Inc., operates 13 ski resorts in the Midwest and Northeast United States. It offers activities, services, and amenities, such as skiing, snowboarding, dining, lodging, equipment rental and sales, and ski and snowboard instruction. It manages hotels in New Hampshire and Vermont and a restaurant in Pennsylvania. The second company, Pairi Daiza SA, operates a park in Belgium that houses approximately 4,000 animals. It also participates in approximately 30 scientific programs for the conservation of endangered species. The third company, Premier Exhibitions, Inc., presents museum quality touring exhibitions to the public worldwide. It also develops, deploys, operates, and presents exhibition products in exhibition centers, museums, and nontraditional venues; sells merchandise through the internet; publishes exhibition catalogs; and provides ancillary services such as audio tours. The fourth company, Vail Resorts, Inc., operates mountain resorts and urban ski areas in the United States. Its resorts offer various winter and summer recreational activities (such as skiing, snowboarding, sightseeing, and guided hiking), and offer skiing and snowboarding lessons, equipment rentals, retail merchandise services, dining services, and private club services. Vail Resorts, Inc., also owns and leases commercial real estate and provides real estate brokerage services, and owns and/or manages various luxury resorts and condominiums. The fifth company, Whistler Blackcomb Holdings, Inc., operates a four season mountain resort in Canada and offers a variety of summer and winter activities such as mountain biking, hiking, fishing, golfing, kayaking, tennis, snowmobiling, cross-country skiing, and horseback riding. It also operates 18 bars and restaurants, 19 retail shops, and 22 rental shops.

Mr. Adams's GPC analysis looked at the size, growth, and liquidity of TBC and his comparable companies. It used the last 12 months' (LTM) earnings before income tax, depreciation, and amortization (EBITDA) and LTM EBIT multiples because, he rationalized, TBC is less profitable than the comparable companies because of their larger scale. He applied a 15% discount to the multiples because of TBC's lack of diversification and resistance to technological development. He added cash and subtracted debt from the enterprise

[*17] value to arrive at a 100% equity value on a noncontrolling, marketable basis and then applied a 30% discount for a lack of marketability to arrive at $10,540,694 on a noncontrolling, nonmarketable basis.

d. *Similar Transactions*

Under the similar transactions method, a value estimate for the subject company is developed by using information obtained from various databases on actual sales of closely held and public businesses. The goal is to define the market for companies operating in the same industry as a subject company by considering the data as a statistical ensemble of value multiples that are representative of the entire market. These valuation multiples are ratios that compare the numerator or the price paid for a controlling interest in a closely held corporation with various measures of operating results in the financial position in the denominator.

Mr. Adams selected six acquisitions as similar transactions. The first acquisition was that of USJ Co., Ltd., which operated a theme park in Japan. Its amenities included restaurants, riding and show attractions, hotels, and shopping and entertainment facilities. The second acquisition was that of Paramount Canada's Wonderland Park, which owns and operates an amusement park. It offers thrill rides, family rides, shopping, splash works, live entertainment, and dining activities. The third acquisition was that of Festival Fun Parks, LLC, which owns and operates family entertainment centers and water parks in the United States. The fourth acquisition was that of American Golf Corp., which owns 22 fee simple and 6 leasehold golf clubs. The fifth acquisition was that of Northern Racing, PLC, which acquires, manages, and develops horseracing courses in the United Kingdom. The company's nine horseracing courses stage various events ranging from large-scale conferences and banquets to business meetings and music events. The sixth acquisition was that of Sydney Attractions Group, Pty Ltd., which offers management and operation of the Sydney Aquarium in Australia. It also operates Manly Oceanworld, an aquarium; Skywalk, an outdoor viewing adventure; Wildlife World, a zoo; and Koala Gallery, a small wildlife park; and it offers Shark Dive Xtreme, a product for scuba divers to swim with sharks, and OzTrek, a virtual reality ride through Australia's cultural history and geography.

Mr. Adams analyzed and computed purchase price multiples from the revenue, EBITDA, and EBIT of these six companies. After applying

**[\*18]** the multiples, he added cash and subtracted debt from the indicated enterprise value to arrive at the indicated equity value of 100% on a controlling, marketable basis. He applied a 20% discount for a lack of control and a 30% discount for a lack of marketability to arrive at a 100% equity noncontrolling, nonmarketable basis of $12,161,048.

### e.    *Final Values*

Mr. Adams chose a combination of the income and market approaches to ascertain the fair market value of the subject stock because, he concluded, a buyer of a restricted minority interest would assume continuation of TBC based on existing dividend trends, rather than assume any liquidation in the face of the opposition to liquidation. He gave each of his methods a weighted average. He gave the DCF method a weighted average of 50% because it was based on TBC's financial projections, expectations, and risk factors. He gave each of the GPC and the similar transactions methods an equal weighted average of 25%. His analysis also included looking at various methods to apply "tax affecting" (discussed *infra* pp. 25–27), and he arrived at one value for each class of stock if he took tax affecting and the 2009 Shareholders' Agreement into account and another value if he did not. His final values included a 30% discount for a lack of marketability and a 20% discount for a lack of control. He concluded that the class A common stock and the class B common stock had a fair market value of $1,019 per share on November 18, 2010, with tax affecting and the shareholder agreement in effect, and that the class B shares of TBC were worth $1,614.71 per share without tax affecting and the shareholder agreement in effect.

### 2.    *Mr. Hawkins*

#### a.    *Background*

Mr. Hawkins of Bannister Financial in Charlotte, North Carolina, specializes in business valuation of closely held companies and the type of stock interest at issue. He holds a bachelor's in economics from the University of North Carolina at Chapel Hill and a master's in business administration from Wake Forest University. He is an accredited senior appraiser in business valuation and a chartered financial analyst.

#### b.    *Capitalization of Net Cashflow*

Mr. Hawkins valued the subject stock using the income approach's capitalization of net cashflow method. This method

**[\*19]** measures the dividend or distribution paying capacity of the company being valued by applying an appropriate capitalization rate that incorporates the investor's required rates of return for risk and a factor for future growth in earnings (or net cashflow). He ascertained that TBC has a net cashflow of $1,162.60 and a capitalization rate of 0.107. Dividing the net cashflow by the capitalization rate rendered a preliminary value of equity of $10,865.40 as if TBC was a C corporation.

Mr. Hawkins then tax affected the preliminary value using the S Corporation Economic Adjustment Model (SEAM). The SEAM values the S corporation's shares as if the S corporation paid the same level of taxes as a C corporation. He used TBC's dividend/distribution payout ratio, the taxes that would be paid on its income, dividends, and any capital gains on shares to calculate the difference in the net tax benefit realized by the company as a C corporation and as an S corporation. He ascertained that there would be a 24.6% greater after tax benefit of an S corporation in these cases. He tax affected what he had ascertained was the preliminary value of equity by a rate of 24.6% to arrive at an adjusted S corporation value of common equity of $13,638.30. After dividing the adjusted S corporation value of common equity by the number of outstanding shares, he arrived at a preliminary fair market value per share of $1,353.83.

c.     *GPC*

Mr. Hawkins also used the market approach's GPC method to value the subject shares. He used Cedar Fair, L.P. (Cedar Fair), as a comparable company because theme parks are a competitor of TBC and it is similarly aligned with the services offered. Cedar Fair operates in the United States 11 amusement parks, 6 water parks, and 5 hotels. Of Cedar Fair's total 2009 revenues, 58.2% came from admissions, 34.5% from food, drink, and games, and the remaining 7.3% from accommodation and other. He viewed these percentages as similar to TBC's 2009 revenues from admissions, restaurants and merchandise, and from all other sources, respectively.

After comparing the size, profitability, return on equity, growth trends, business opportunities, diversification, financial strength, and distributions of Cedar Fair and TBC, Mr. Hawkins selected the Market Value of Invested Company to Earnings Before Income Taxes, Depreciation, and Amortization (MVIC/EBITDA) value multiple. He applied the MVIC/EBITDA value multiple to two time frames: (1) the EBITDA of the trailing 12 months (TTM) of the valuation date and

**[\*20]** (2) the median of 2006 to TTM. He applied the multiples to TBC's adjusted EBITDA to arrive at the preliminary values of $1,508.10 and $1,661.53.

He applied a 25% discount for a lack of marketability and a 2% discount for a lack of voting rights to the GPC method. He concluded that the applicable fair market value of the class A common stock was $1,131 per share and that the applicable fair market value of the class B common stock was $1,108 per share.

d.    *Asset-Based Valuation*

Mr. Hawkins chose not to value the subject stock on the basis of TBC's assets because he was valuing a minority issue with no power to force a liquidation. He rationalized that TBC's shareholders would not liquidate given that TBC had survived through four generations of the family of Cornelia Cecil and was the subject of the 2009 Shareholders' Agreement. He concluded that a willing buyer with knowledge of these facts would assume that it was too speculative to believe that he or she would realize anything significant from the underlying assets.

C.    *Respondent's Experts*

Respondent's experts are Gretchen Wolf and Robert Morrison.

1.    *Ms. Wolf*

Ms. Wolf appraises art for the IRS Office of Art Appraiser Services. She has a certification in appraisal studies for fine and decorative arts from George Washington University and attended programs at the University of Virginia's Rare Book School and Georgetown University for continuing coursework in rare books and fine arts. She has completed valuation training with the American Society of Appraisers.

Ms. Wolf valued the five aforementioned works of art owned by TBC using the market comparison approach. She looked at comparable sales that had taken place in high-end auction houses and the retail market where private sales take place. She did not value the artwork using the income approach because the artwork has little income-

[*21] producing value to TBC. She appraised the artwork at a total of $13,250,000 as of November 19, 2010.[5]

2.    *Mr. Morrison*

a.    *Background*

Mr. Morrison works for Morrison Valuation and Forensic Services as a forensic accountant and business appraiser. He has a bachelor's of science in finance from Miami University (Ohio) and a master's in business administration from the University of Central Florida. He has an accredited senior appraisers certification and an intangible asset certification.

b.    *NAVM*

Mr. Morrison appraised the subject stock using the asset-based approach's net asset value method (NAVM). The general premise of the NAVM is that value equals the sum of the market values of all assets, including those assets which may not be recorded on the company's balance sheet, less the share of the market values of liabilities. He applied the NAVM in two steps. First, he identified all assets and liabilities of TBC regardless of whether they were recorded on the balance sheet and ascertained the fair market value of the assets and liabilities identified. Second, he ascertained an appropriate adjustment to reflect the noncontrolling nature of the subject stock.

TBC's reported assets were $53,580,000 and its liabilities were $33,349,000 on November 30, 2010. The difference of $20,231,000 is the net asset value (NAV) before adjustments. Mr. Morrison made two types of adjustments: reclassification adjustments (which do not affect the NAV) and valuation adjustments. He made the following valuation adjustments.

*Real Estate*. Mr. Morrison relied on a real estate appraisal report prepared by Ducksworth, Jacobs, Naeger, Swicegood & Thrash, LLC (Duckworth Appraisal). The effective date of the Duckworth Appraisal is December 31, 2009, almost 11 months before the valuation date. During those 11 months, the value of agricultural land in North Carolina declined approximately 2%. Mr. Morrison adjusted the Duckworth Appraisal downward by 2% which resulted in a real estate

_____

[5]As indicated *infra* p. 22, Mr. Morrison, in taking into account TBC's collectible portfolio, relied on Ms. Wolf's appraisal.

[*22] value of $95,922,000.  This resulted in an increase of $71,652,000 to his NAV.

*Collectible Portfolio.*  Mr. Morrison took into account TBC's portfolio of fine art, antiques, and other collectibles.  He relied on an appraisal report from Christie's Appraisal, Inc., which estimated that those items had a total fair market value of $37,947,000 on December 31, 2009 (Christie's Appraisal).  The appraisal was later supplemented to include additional collectibles valued at $3,474,000 (Christie's Supplement).  He also relied on Ms. Wolf's appraisal.  His combining the Christie's Appraisal value (unadjusted for Ms. Wolf's appraisal value) with the Christie's Supplement value resulted in a total value of $41,421,000 for TBC's collection.  This resulted in an increase of $41,421,000 to his NAV.

*Installment Note Receivable.*  TBC reported on its balance sheet that the installment note that it received in the West Range sale/leaseback transaction had a value of $554,000, the amount deferred on the gain.  Mr. Morrison adjusted the value of the note to $2,700,000, the amount of the remaining payments.  This resulted in an increase of $2,146,000 to his NAV.

*Trademarks and Trade Name.*  Mr. Morrison employed the Relief from Royalty Method (RFRM) to value TBC's trademarks and trade name.  The premise of the RFRM is that the value of the asset is equal to the present value of future royalties to license and use the asset as if it did not own the asset (hence, relief from royalty).  Using the RFRM, he estimated the value of TBC's trademarks and trade name was $9,514,000.  This resulted in an increase of $9,514,000 to his NAV.

*Workforce-in-Place.*  Mr. Morrison estimated that TBC had 1,700 workers in place and rationalized that, while many of these workers were unskilled, hourly employees, the assemblage of this workforce-in-place had value.  He ascertained the value using the replacement cost method (RCM).  The premise of the RCM is that the value today equals the cost to reproduce/replicate the asset.  He ascertained that the value of the workforce-in-place was $1,624,000.  This resulted in an increase of $1,624,000 to his NAV.

After he made the valuation adjustments, the NAV was $146,587,000.  The NAVM assumes a marketable, liquid, and controlling interest whereas the subject stock is nonmarketable, illiquid, and noncontrolling.  To adjust for this, Mr. Morrison looked in markets

[*23] for noncontrolling interests and chose real estate limited partnerships (RELP) and closed-end funds (CEF). He rationalized that his observed prices to NAV (P/NAV) of RELPs and CEFs that held assets similar to TBC's provided some guidance as to a proper adjustment. For purposes of this analysis, he considered all of the operating assets (excluding real estate) as a portfolio of assets, then considered each asset individually. After he estimated the P/NAV of RELPs and CEFs, the value indicated by the NAVM is $92 million on a noncontrolling but marketable and liquid basis.

c.     <em>DFBM</em>

Mr. Morrison also valued the subject stock using the income approach's discounted future benefits method (DFBM). The DFBM values a company at the present value of expected future periodic income benefit stream during a discrete time plus residual value at the end of the period and discounts for the relative risk of expected future returns. He employed the following seven steps to ascertain value under the DFBM: (1) selected the benefit stream to be used; (2) projected the future annual benefit streams until the company reaches stabilization; (3) estimated the residual or terminal value of the company at the end of the discrete projection period; (4) estimated an appropriate discount rate for the company that compensates both the equity holders and the debt holders of the company and a stabilized long-term rate of growth; (5) discounted all future benefit streams, including the residual value, to present value; (6) adjusted, as appropriate, for nonoperating assets and/or liabilities; and (7) applied any necessary valuation adjustment.

Mr. Morrison chose an after-tax net cashflow to equity (NCF) benefit stream because the data used to develop capitalization rates and discount rates are based on after-tax cashflows. After projecting the future annual benefit streams, he used the single-period capitalization model (SPCM) to estimate the residual or terminal value. He opined that the premise of the SPCM is that the stabilized NCF at the end of the discrete projection period will grow into perpetuity at some stabilized level of annual growth. He ascertained that the terminal value as of the end of the discrete period is determined by capitalizing that stabilized NCF; and by using a growth rate of 3%, he ascertained that the stabilized benefit stream of the last year of the discrete projection period was $1,773,000. He used a 16% cost of equity as his discount rate. After discounting the future benefits streams, the sum of all present values of all cashflows is $12,931,000. Because TBC is an S corporation, Mr. Morrison used the SEAM method to tax affect at a

**[\*24]** premium of 17.6%. He next added the values for various nonoperating assets. Using the DFBM, he reached a value of $36 million.

### d. *Reconciliation of Two Approaches*

In reconciling his two approaches, Mr. Morrison concluded that the P/NAVs may not actually reflect TBC's circumstances because TBC, contrary to RELPs and CEFs, does not seek to maximize its assets. He also recognized that the DFBM is superior but chose to incorporate the NAVM into his final evaluation. Ultimately, he assigned a 90% weight to the DFBM and assigned a 10% weight to the NAVM. He also ascertained and took into account discounts for a lack of marketability of 19% for the class A common stock, 22% for the smaller block of class B common stock, and 27% for the larger block of class B common stock. His resulting values were $4,000 per share for the class A common stock, $3,066 per share for the 2,334.25 larger block of class B common stock, and $3,276 per share for the 1,556.16 2/3 smaller block of class B common stock.

### D. *Summary*

Below is a summary of the fair market values ascertained by each expert less Ms. Wolf (three relevant experts):

| *Class of Stock* | Adams | Hawkins | Morrison |
| --- | --- | --- | --- |
| Class A Common | $1,019.00 (with tax affecting) | $1,131 (with tax affecting) | $4,000 (with tax affecting) |
| Class B Common (Smaller Block) | 1,019.00 (with tax affecting) 1,614.71 (without tax affecting) | 1,108 (with tax affecting) | 3,276 (with tax affecting) |
| Class B Common (Larger Block) | 1,019.00 (with tax affecting) 1,614.71 (without tax affecting) | 1,108 (with tax affecting) | 3,066 (with tax affecting) |

**[\*25]** IV.    *Tax Affecting*

With the exception of Ms. Wolf, whose appraisal was limited to the five pieces of artwork, all experts agree that "tax affecting" must be considered to ascertain the fair market value of the subject stock because an S corporation such as TBC, unlike a C corporation, generally does not pay income tax. Where, as here, the data used to value an S corporation are largely based on the data from C corporations, proponents of tax affecting believe that the mismatch from pretax cashflows and after-tax discount rates must be adjusted through tax affecting to ascertain the fair market value of the S corporation. *See Dallas v. Commissioner*, T.C. Memo. 2006-212, slip op. at 7 n.3 (stating that "in the context of valuation of stock of an S corporation, 'tax affecting' is the discounting of estimated future corporate earnings on the basis of assumed future tax burdens imposed on those earnings, such as from the loss of S corporation status and imposition of corporate-level tax").

In *Gross v. Commissioner*, T.C. Memo. 1999-254, *aff'd*, 272 F.3d 333 (6th Cir. 2001), we held that tax affecting was improper in valuing an S corporation. There, the taxpayer sought tax affecting and the Commissioner argued against it. We held that "[a]s a theoretical matter, we do not believe that 'tax-affecting' an S corporation's projected earnings is an appropriate measure to offset that potential burden associated with S corporations." *Id.* slip op. at 24. We concluded that

> the principal benefit that shareholders expect from an S corporation election is a reduction in the total tax burden imposed on the enterprise. The owners expect to save money, and we see no reason why that savings ought to be ignored as a matter of course in valuing the S corporation.

*Id.* slip op. at 27.

We continued to reject applying tax affecting to determine an S corporation's fair market value. *See Estate of Gallagher v. Commissioner*, T.C. Memo. 2011-148, slip op. at 32, *supplemented by* T.C. Memo. 2011-244 (finding tax affecting not appropriate where appraiser failed to explain his reasoning for tax affecting); *Dallas*, T.C. Memo. 2006-212 (finding tax affecting not appropriate when the taxpayer presumed that an S corporation would lose its S corporation status after a sale); *Wall v. Commissioner*, T.C. Memo. 2001-75, slip op. at 27 n.19 ("[T]ax-effecting an S corporation's income, and then

**[\*26]** determining the value of that income by reference to the rates of return on taxable investments, means that an appraisal will give no value to S corporation status."); *see also Estate of Giustina v. Commissioner*, 586 F. App'x 417 (9th Cir. 2014), *rev'g and remanding* T.C. Memo. 2011-141.

In *Estate of Jones*, T.C. Memo. 2019-101, however, we concluded that tax affecting was appropriate in that setting. There, the parties agreed that a hypothetical buyer and seller would take into account the entity's business form when determining the value of a limited partner interest; they simply disagreed on how to account for it. The Commissioner argued that a zero percent tax rate should apply. The Commissioner disagreed with his experts, who were largely silent except to point out that the taxpayer's tax affecting was improper, not because the business paid entity level tax, but because the nature of the business meant that its rates of return were closer to the property rates of tax. Thus, we did "not have a fight between valuation experts but a fight between lawyers." *Id.* at \*39.

Most recently, in *Estate of Jackson v. Commissioner*, T.C. Memo. 2021-48, we did not find tax affecting appropriate. There, all of the estate's experts agreed that the buyer would be a C corporation and that the value should be tax affected to account for the tax liability of the C corporation. Each expert, however, used a different tax rate. The Commissioner's experts strongly disagreed that tax affecting was appropriate. We distinguished *Estate of Jones* by noting that *Estate of Jones* was a situation where the experts agreed to take into account the form of the business entity and agreed on the entity type. We held that tax affecting would not be appropriate because the estate's experts had not persuaded us that the buyers would be C corporations. *Id.* at \*82. We also stated, though, that

> [w]e do not hold that tax affecting is never called for. But our cases show how difficult a factual issue it is to demonstrate even a reasonable approximation of what that effect would be. In *Estate of Jones*, there was expert evidence on only one side of the question, and that made a difference.

*Id.* at \*82–83.

Here, experts on both sides agree that tax affecting is necessary to value the subject stock. Messrs. Morrison and Hawkins also agree

[*27] that the SEAM method is the appropriate method to employ in the setting at hand to account for tax affecting and that a factor of at least 17.6% applies here for that purpose. As we observed in *Estate of Jackson*, there is not a total bar against the use of tax affecting when the circumstances call for it. Now given that each side's experts (with the exception of Ms. Wolf who did not opine on this point) totally agree that tax affecting should be taken into account to value the subject stock, and experts on both sides agree on the specific method that we should employ to take that principle into account, we conclude that the circumstances of these cases require our application of tax affecting. While Messrs. Morrison and Hawkins do not agree on the specific rate that applies here to implement tax affecting (Mr. Hawkins determined the rate to be 24.6% while Mr. Morrison determined the rate to be 17.6%), we consider it appropriate on the basis of the record (and relying on Mr. Morrison's opinion in this regard) to set that rate at 17.6%. We emphasize, however, that while we are applying tax affecting here, given the unique setting at hand, we are not necessarily holding that tax affecting is always, or even more often than not, a proper consideration for valuing an S corporation.

V. *Our Impression of the Experts*

A. *Mr. Morrison*

We are unpersuaded by Mr. Morrison's opinion on the fair market value of the subject stock. In that TBC is an operating company whose existence does not appear to be in jeopardy, and not a holding company, we believe that TBC's earnings rather than its assets are the best measure of the subject stock's fair market value. *See Estate of Ford v. Commissioner*, T.C. Memo. 1993-580, 1993 Tax Ct. Memo LEXIS 595, at *14 (1993) ("[P]rimary consideration is generally given to earnings in valuing the stock of an operating company, while asset values are generally accorded the greatest weight in valuing the stock of a holding company."), *aff'd*, 53 F.3d 924 (8th Cir. 1995).

Mr. Morrison's reliance on the asset-based approach also appears to be inconsistent with the Uniform Standards of Professional Appraisal Practice (USPAP). USPAP Standards Rule 9-3 states:

> In developing an appraisal of an equity interest in a business enterprise with the ability to cause liquidation, an appraiser must investigate the possibility that the business enterprise may have a higher value by liquidation

**[\*28]** of all or a part of the enterprise . . . . However, this typically applies only when the business equity being appraised is in a position to cause liquidation.

That is not the setting here. The liquidation of TBC is most unlikely (if likely at all) in that a hypothetical buyer and seller would need to (1) acquire additional shares in order to cause TBC's liquidation; (2) convince other shareholders to vote for a liquidation; or (3) wait until the shareholders or their heirs decide to liquidate TBC, and we consider each of these three events unlikely to occur. Bill Cecil, Dini Pickering, Chase Pickering, Aubrey Cecil, and Ryan Cecil all credibly testified that they had no intention of selling their TBC stock or liquidating TBC, and we find that testimony as a fact. In so doing, we decline respondent's request to disregard that testimony as self-serving. The mere fact that a witness's testimony may serve his or her interests does not necessarily mean that we will disregard that testimony as untrustworthy. *See, e.g.*, *Diaz v. Commissioner*, 58 T.C. 560, 564 (1972). Our acceptance of their credible "self-serving" testimony is even more appropriate here, where documentary and other evidence supports that testimony. The 2009 Shareholders' Agreement and the 1999 Voting Trust sufficiently established that petitioners, their children, and their grandchildren aspired to keep TBC in their family by restricting the transfer of stock outside of the family. We also understand the family's holding of the annual meetings to serve strategically to minimize and control business disputes that could occur within the family, to obviate any TBC shareholder's rogue attempt to sell his or her TBC shares to an outsider, and to make most unlikely any breakup of TBC similar to the breakup effected by Mr. Cecil and his brother in 1979. These meetings also serve to groom TBC's shareholders to manage TBC as a family asset. The fact that TBC has been in the family since its incorporation in 1932 also speaks loudly to the fact that the Cecil and the Pickering families are committed to maintaining TBC as a family business.

We assign zero weight to Mr. Morrison's valuation opinion.

B. *Mr. Hawkins*

We also have concerns with the thrust of Mr. Hawkins's valuation opinion. In using the GPC method to value the subject stock, he relied on a single company, Cedar Fair. We have previously held that it is inconceivable that a hypothetical buyer would consider only a single alternative comparable. *See Estate of Hall v. Commissioner*, 92 T.C. 312, 339–40 (1989). Although Cedar Fair does operate competitors of TBC,

[*29] the lack of multiple comparable companies renders his GPC appraisal suspect. Furthermore, TBC lacks the traditional features of its competitors such as diversification. Cedar Fair is larger, more diversified, and more profitable than TBC.

Nor did we view Mr. Hawkins during his trial testimony to express much confidence in his GPC analysis. He acknowledged that Cedar Fair operates at a national level while TBC operates at a regional level. He acknowledged that Cedar Fair's 2009 admissions revenue is significantly greater than TBC's 2009 admissions revenue. He acknowledged that Cedar Fair's 2009 pretax profit was significantly greater than TBC's 2009 pretax profit. While multiples could be found that would have made Cedar Fair more comparable, the fact that Cedar Fair is the only comparable company Mr. Hawkins used and that it is so different renders questionable his decision to give the GPC method a 50% weight.

We also find fault with Mr. Hawkins's application of the capitalization of net cashflow method. In his calculations, he used TBC's median 2006 to TTM 2010 EBT. Between 2007 and 2009, the United States and much of the world experienced the Great Recession, the worst economic downturn since the Great Depression. Given the timing of the Great Recession and TBC's loss for 2008, the only year since 1995 that TBC had realized a loss, we consider the 2008 loss to be an aberration in TBC's financial operations and do not think it was appropriate for Mr. Hawkins to have included TBC's 2008 financial information in his analysis. While we recognize that his use of the median rather than the average helps mitigate the distortion caused by the Great Recession, the distortion is large enough that it renders his analysis on this point unpersuasive.

C.  *Mr. Adams*

Mr. Adams's application of the GPC and similar transactions methods also has flaws. In his GPC valuation, he found five comparable companies. Two of those companies are not comparable at all. TBC is in the business of historic hospitality. Its guests enjoy retail shopping, restaurants, and various outdoor activities in an environment reminiscent of the Gilded Age. While Peak Resorts, Inc., Vail Resorts, Inc., and Whistler Blackcomb Holdings, Inc., operate resorts that similarly offer various outdoor activities in the hospitality business, the same is not true as to Pairi Daiza SA and Premier Exhibitions, Inc. The former operates a park which houses thousands of animals, and it does

[*30] so at a location (in Belgium) that is vastly different from western North Carolina.  The latter presents museum exhibitions outside of the hospitality industry and does that worldwide while TBC's operation is limited to a single city, Asheville, and the surrounding area.

With regard to Mr. Adams's similar transactions valuation, two of the six transactions occurred during the Great Recession.  American Golf Corp. was acquired on October 29, 2008, and Sydney Attractions Group, Pty Ltd., was acquired on February 29, 2008, and we find it most likely that the Great Recession affected the purchase prices in those two transactions.  We also add that American Golf Corp. and Sydney Attractions Group, Pty Ltd., are not in the same hospitality industry as TBC.  The former owns and operates golf courses.  The latter primarily operates the Sydney Aquarium.  We fault Mr. Adams for including those two transaction in his analysis.

Notwithstanding the flaws in Mr. Adams's applications of the GPC and similar transactions methods, however, we do not find those flaws to be fatal to his overall opinion.  It is abundantly clear that TBC is a unique company and finding an exact match would be near to impossible.  We consider it noteworthy that Mr. Adams assigned only a 25% weight to each method, which as we see it, adds a degree of reliability to his application of the GPC and similar transactions method.

Most importantly, the thrust of his overall opinion is his application of the DCF method, an application with which we find no fault.  Indeed, on brief, respondent urges us to adopt Mr. Adams's valuation based on his DCF analysis with one correction.  After determining the MVIC, Mr. Adams added back the value of TBC's nonoperating asset, which was TBC's excess debt-free working capital.  Respondent contends that the installment note from the West Range transaction, accounts receivable from the shareholders, and Busbee Mountain were nonoperating assets whose value should also be added back.  We disagree.  Mr. Adams included the excess debt-free working capital because it added value to the TBC stock in that TBC funds would be available for distribution to the shareholders at the end of the year.  TBC's underlying assets did not add any value to the TBC stock.

D.    *Conclusion*

We find flaws with Mr. Hawkins's and Mr. Morrison's analyses that lead us to disregard the thrust of their opinions on the fair market

[*31] value of the subject stock. While there are issues with Mr. Adams's application of the GPC and similar transactions methods, we find that his valuation (exclusive of the discounts discussed below), with one adjustment, is the truest value of the subject stock's prediscount fair market value. The single adjustment, as discussed above, is that tax affecting should be reflected at a rate of 17.6%.

VI.   *Applicable Discounts*

   A.      *Discount for a Lack of Control*

Mr. Adams applied a discount for a lack of control to the similar transactions method because, he surmised, a prudent investor would not pay full value for a noncontrolling interest. TBC's owners also made no effort to sell TBC in the marketplace and had previously rejected overtures to sell TBC. Mr. Adams reviewed publicly announced transactions of noncontrolling interests and arrived at a 20% discount for a lack of control.

Mr. Morrison looked at various RELPs and CEFs, which often trade at discounts for a lack of control, and arrived at a 38% discount. We disagree with Mr. Morrison's discount because his analysis focused on businesses holding investments rather than on operating companies like TBC. We accept Mr. Adams's discount rate of 20% for a lack of control.

   B.      *Discount for a Lack of Voting Rights*

Mr. Hawkins applied a 2% discount in valuing the class B common stock because, he concluded, that stock lacked voting rights. That conclusion is not totally accurate in that class B shareholders can vote in limited circumstances. Mr. Hawkins also misrelied on two studies which analyzed data from 1994 and 1999. Those data are too old. Furthermore, in arriving at their values, each of the three relevant experts already accounted for the fact that he was valuing a nonvoting minority interest. We decline to apply a discount for a lack of voting rights.

   C.      *Discount for a Lack of Marketability*

Each of the three relevant experts applied a discount for a lack of marketability because the shares are not registered for public sale or sold on public markets. Mr. Adams applied a discount rate of 30% to each method he used. Mr. Hawkins applied a 25% discount rate. Mr.

**[*32]** Morrison applied a discount rate of 19% to the class A common stock, of 22% for the smaller block of class B common stock, and of 27% for the larger block of class B common stock.

In arriving at his discount rate, Mr. Adams looked at studies of the sales of temporarily restricted shares of otherwise publicly traded companies (letter stock) and sales of closely held companies before subsequent initial public offerings (IPO). He also conducted a put option analysis. We are not sold on that process. The studies that Mr. Adams relies on analyze data that are too old, e.g., the latest study looks at data from 1969 to 1992, and most of the studies look at data from the 1970s and 1980s. He also admits that the pre-IPO studies are unreliable and may overestimate or underestimate actual marketability discounts. And as for his put option analysis, which produced a range of discount rates from 11.6% to 22.6%, we cannot fathom how that analysis supports his final discount rate of 30%.

We turn to the discount rates ascertained by Mr. Hawkins and Mr. Morrison. We conclude that the appropriate discount rates are the three rates that Mr. Morrison ascertained. It is logical for us to conclude that the smaller blocks of class B common stock would be more easily marketed than the larger blocks of the class B common stock. We also agree with Mr. Morrison that different discount rates should apply to the two classes of stock because the voting rights that attach to the class A stock should make that class of stock more marketable than the class B common stock.

VII.  *Conclusion*

We accept the valuation reached by Mr. Adams before he took into account any tax affecting and before he applied any discounts. We accept Mr. Adams's 20% discount for a lack of control and Mr. Morrison's discount rates of 19%, 22%, and 27% for a lack of marketability.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*